**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**CRYSTAL PHOTONICS, INC.,**

      **Plaintiff,**

**v.**                                                                               **Case No: 6:11-cv-1118-Orl-31DAB**

**SIEMENS MEDICAL SOLUTIONS USA,**
**INC.,**

      **Defendant.**

## ORDER

This matter comes before the Court after a September 18, 2012 *Markman* hearing on the request (Doc. 42) to construe terms in U.S. Patent No. 7,151,261 (henceforth, the "'261 Patent"). The request was filed jointly by the Plaintiff, Crystal Photonics, Inc. ("CPI"), and by the Defendant, Siemens Medical Solutions USA, Inc. ("Siemens "). In addressing the request, the Court has considered the claim construction briefs filed by CPI (Doc. 50) and by Siemens (Doc. 51), as well as CPI's rebuttal brief (Doc. 54) and that of Siemens Medical (Doc. 55).

**I.**     **BACKGROUND**

This patent infringement case involves lutetium orthosilicate ("LSO") crystals, which are used in a medical imaging process known as positron emission tomography ("PET") scanning. To accomplish a PET scan, the subject first ingests a radioactive isotope that is attracted to certain body parts (such as tumors). As the radioactive isotope decays, it emits positively charged particles known as "positrons". Usually within a very short distance of the point from which it was omitted, the positron will encounter an electron. The encounter results in the destruction of

both the positron and the electron and the emission of two photons, which travel in opposite directions from one another.

The subject is placed inside a PET scanning machine that includes, among other things, a ring of small crystals that light up when struck by a photon. (More particularly, the crystals absorb the energy from a photon and re-emit it in the form of light.) When one of these crystals lights up, a photodetector associated with that crystal sends a signal to a computer. When the computer receives signals from photodetectors on opposite sides of the ring essentially simultaneously, it can determine the origin point of the photon emission along an imaginary line drawn between the two crystals. The computer plots these origin points onto a grid, providing a three-dimensional picture of the tumor or other item being studied.

The crystals used in PET scanners are known as scintillators. There are a number of qualities that make different crystals more or less useful as scintillators, including their light yield, their decay rate, and their energy resolution.[1] In PET scanners, crystals with higher light yields, faster decay rates, and narrower energy resolutions are preferred.

Originally, PET scanners employed bismuth germanate ("BGO") crystals. In the 1980s, cerium doped gadolinium orthosilicate ("GSO") crystals were developed for use in PET scanners. GSO crystals have almost twice the light yield of BGO crystals.[2] LSO crystals, which were patented in the early 1990s, had roughly three times the light yield of GSO crystals, or more. PET scanners employing LSO crystals are able to produce sharper and more well defined images than those produced by PET scanners using BGO crystals or GSO crystals.

---

[1] Simply stated, a scintillator's "light yield" is a measure of how bright it becomes when struck by a photon; its "decay rate" describes how quickly the scintillator returns to its unlit state after lighting up; and its "energy resolution" is essentially a measure of the width of the light beam emitted by the scintillator when it lights up.

[2] The light yield of a scintillating crystal is described by reference to the light yield of BGO, which is set at 100. Thus, the light yield of GSO crystals is almost 200.

LSO crystals are grown in a lab.  The raw materials, in powder form, are melted in a crucible that can withstand the high temperatures involved – on the order of 2000 degrees Celsius.  A rod with a seed crystal on the end is then inserted into the melted material.  As the LSO crystal forms around the seed crystal, the rod is slowly withdrawn from the melted material, a process that results in a large cylindrical crystal known as a boule.  After finishing its growth, the boule is cut into many smaller crystals (referred to as pixels), which can then be installed into the detector ring of a PET scanner.

LSO crystals grown in this fashion suffered from at least one shortcoming not found in BGO crystals or GSO crystals: a large variance in light yield and energy resolution[3] from one crystal boule to the next, and even from top to bottom within the same boule.  For PET scanners, scintillators with uniform light yields and energy resolution are preferred.  Due to the variation problem, the pixels would have to be carefully tested and sorted into groups with similar light yields and energy resolutions before installation into a detector ring.  This sorting process increased the cost of manufacturing.

Originally, it was thought that the variation was caused by impurities in the crystals, perhaps introduced during the growing process.  Eventually, inventor Bruce Chai theorized that the variation resulted from oxygen vacancies in the crystals.  After experimentation, Chai came up with a method for filling those vacancies by heating the LSO crystals in the presence of oxygen for extended periods.  The parties agree that LSO crystals treated with Chai's method have improved light yields and are more uniform; rather than having light yields ranging from about 300 to about 450, they generally have light yields in the high 500s to low 600s.

---

[3] Energy resolution is the ratio (expressed as a percentage) of the light yield over the wavelength of the light at full width/half maximum (FWHM).

The '261 Patent, which teaches Chai's method, is entitled "Method of Enhancing Performance of Cerium Doped Lutetium Orthosilicate Crystals and Crystals Produced Thereby". It issued from an application filed on January 9, 2004. The '261 Patent is assigned to Plaintiff CPI. On July 7, 2011, CPI filed the instant suit, alleging that Defendant Siemens committed infringement by selling PET scanners containing LSO crystals that have undergone the process described in the '261 Patent.

## II. STANDARDS

It is well established that patent claim construction is a question of law for the Court's determination. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) aff'd, 517 U.S. 370, 116 S. Ct. 1384, 134 L. Ed. 2d 577 (1996). The goal is to determine how a patent claim's terms would be understood by a person of ordinary skill in the relevant art at the time of the invention. *Id.* at 986. This analysis begins with an examination of the intrinsic evidence, that is, the claims, the patent specification, and the prosecution history. *Apex Inc. v. Raritan Computer, Inc.*, 325 F.3d 1364, 1371 (Fed. Cir. 2003). Among these forms of intrinsic evidence, the analysis begins first with a claim's terms and the "strong presumption" that they carry their ordinary meaning as viewed by a person of ordinary skill in the art. *Id.* Although the Court may rely on extrinsic evidence, such as expert testimony, that is appropriate only to the extent the Court is unable to construe the disputed terms from the totality of intrinsic evidence. *Vitronics Corp. v. Conceptronic Inc.*, 90 F.3d 1576, 1584 (Fed. Cir. 1996).

## III. ANALYSIS

The '261 Patent contains 28 claims. It contains two independent claims – claim 1 and claim 19. The parties agree that only the two independent claims require construction. Those claims read as follows:

<u>claim 1</u>

A method of enhancing performance of a body of monocrystalline cerium doped lutetium orthosilicate (LSO) in response to irradiation with high energy radiation, the method comprising:

diffusing oxygen into the body of monocrystalline LSO by heating the body for a period of time in an ambient containing oxygen.

<u>claim 19</u>

A method of enhancing performance of a body of monocrystalline cerium doped lutetium orthosilicate (LSO) in response to irradiation with high energy radiation, the body of monocrystalline LSO having oxygen vacancies therein, the method comprising:

supplying oxygen to fill at least some of the oxygen vacancies in the body of monocrystalline LSO.

The parties seek construction of numerous terms appearing in one or both of these independent claims, each of which is addressed below. No party has argued that any term has a different meaning when used in one of the independent claims than it has when used in the other.

## "SUCH METHOD OCCURRING AFTER THE BODY OF LSO HAS BEEN REMOVED FROM THE GROWTH CHAMBER"

Siemens argues that the '261 Patent teaches a method that can only be performed after the LSO crystal has been fully formed and removed from the growth chamber. To reflect this, Siemens contends that the above-quoted phrase should be inserted into the preambles of both independent claims. Specifically, Siemens seeks to have the phrase inserted just before the phrase "the method comprising:". (Doc. 51 at 8).

Siemens correctly points out that at various points the specification describes the growth of the LSO crystal and the oxygenation process as separate steps occurring in separate locations. For example, Figure 5 of the '261 Patent (Doc. 1-1 at 8) is a flow chart illustrating an industrial process employing the invention. The chart includes references to both a "crystal growth furnace" and, in a separate step, to an "oxygen diffusion furnace".

In addition to describing the crystal growth and the oxygen diffusion as occurring in different furnaces, the patent can be read to suggest that the temperatures involved require such a relocation. The background section of the '261 Patent explains that the melting point of an LSO crystal is so high – 2150º C – that "it is necessary to use an iridium metal crucible as the container" for the molten material that will become the LSO crystal. (Patent Col. 3 at ll. 27-30). Iridium has a melting point of 2450º C. (Patent Col. 3 at ll. 31-32). In contrast, the oxygenation method described in the '261 Patent utilizes maximum temperatures of about 1400º C and can therefore employ containers made of materials with much lower melting points than that of iridium.

Though its high melting point makes it well suited for use in the process of growing LSO crystals, iridium has another quality that makes it less well suited for use with oxygen:

> Even though iridium is quite inert and stable, it does oxidize in air at such high temperatures.  To prevent metal loss of the iridium crucible, it is necessary to grow the crystals in either a vacuum or in furnaces purged with argon or nitrogen gas, so that the ambient oxygen in the growth chamber is kept below approximately 1%.

(Patent Col. 3 at ll. 32-37). Moreover, as described below, Chai informed the patent examiner that his invention cannot be practiced where the oxygen concentration of the ambient is less than 1 percent, even when no iridium is involved. Because the oxygenation method taught by the '261 Patent requires an ambient containing more than 1 percent oxygen, and because the specification states that iridium crucibles are "necessary" for crystal growth and would be damaged by such an ambient, Siemens argues that the patent teaches that the oxygenation cannot be performed in the same furnace as the one used to grow the crystal.

While it is indeed true that, as Siemens argues, the oxygenation method as described in the '261 Patent is a post-growth process (in that, until there is a crystal, there is nothing to oxygenate), nothing in the specification or outside of it requires that this process occur in a separate location

- 6 -

from the one in which the crystal growth occurred.[4]  The examples and descriptions that Siemens points to as requiring such relocation are preferred embodiments, not necessarily the only embodiment.  "In reviewing the intrinsic record to construe the claims, we strive to capture the scope of the actual invention, rather than strictly limit the scope of claims to disclosed embodiments or allow the claim language to become divorced from what the specification conveys is the invention."  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1323-24 (Fed.Cir. 2005) (*en banc*).

The patent makes it clear that "[m]ethods and materials similar or equivalent to those described herein can be used in the practice or testing of the present invention."  (Patent Col. 5 ll. 47-49).  Siemens has not shown that, as a practical matter, different materials or methods could not be utilized to overcome the iridium-oxidation issue and allow the patented method to be performed in the same furnace in which the LSO crystal was grown, if one were inclined to do so.  Accordingly, the Court will not insert this phrase into the preamble of the independent claims or construe the patent as having a location requirement.

## "ENHANCING PERFORMANCE"

CPI argues that this phrase, which appears in both independent claims, would be understood by one skilled in the art to mean "increasing the light yield and improving the energy resolution".  Siemens counters that it should be construed to mean "improving at least one scintillation property of a body of LSO".

---

[4] If anything, the specification suggests that oxygenation *will* occur in an iridium crucible.  Chai describes instances when he was growing LSO crystals and oxygen accidentally leaked into the growth chamber, resulting in a "badly burned" iridium crucible and LSO crystals with "a definite improvement in light yield."  (Patent Col. 3 ll. 49-67, Col. 4 ll. 1-4).

At the *Markman* hearing, the parties discussed a number of qualities that affect the performance of a scintillator, but the patent itself lists only three: light yield, energy resolution, and decay rate. (Patent Col. 1 ll. 23-24). Although the specification refers to the decay rate of LSO crystals, there is no suggestion that application of the patented method would affect the crystals' decay rate, and the experiments described in the specification do not show that the decay rate was ever measured, much less improved. In contrast, the inventor repeatedly asserts that the patented method can improve both light yield and energy resolution, and both of those qualities were measured before and after the experiments. (Patent Col. 8 l. 26 to Col. 14 l. 43). Thus, when the patent speaks of "enhancing performance," it can only be referring to improving the qualities of light yield and energy resolution. The parties' dispute on this point boils down to whether the term should be interpreted as referring to improving either of these qualities, or both of them.

Siemens asserts that interpreting the phrase as referring to both qualities is inconsistent with the language used in several dependent claims, and violates the doctrine of claim differentiation. In particular, Siemens argues that this interpretation would render the following claims meaningless:

>  claim 16
>
> The method of claim 1, wherein the diffusing results in an increased performance based upon a light yield of the body of monocrystalline LSO.
>
> claim 17
>
> The method of claim 1, wherein the diffusing results in increased performance based upon an improved energy resolution of the body of monocrystalline LSO."

- 8 -

(Patent Col. 16 ll. 23-28). [5] Siemens argues that if claim 1 is interpreted to refer to improvements of *both* light yield and energy resolution, these claims would be rendered meaningless. Their proposed limitations – increased performance based upon light yield in the case of dependent claim 16, and increased performance based upon improved energy resolution in the case of dependent claim 17 – would already be present in the independent claim from which they depend. Siemens argues that CPI's proposed construction runs afoul of the doctrine of claim differentiation, which provides that "the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." *Phillips*, 415 F.3d at 1315.

CPI's proposed interpretation does not conflict with the doctrine of claim interpretation and does not render any dependent claims meaningless, because the phrase "enhancing performance" is not limiting as used in this patent. The phrase "enhancing performance" appears in the preamble of both independent claims.

> A patent claim is normally divided into three sections: (1) the preamble; (2) the transition; and, (3) the body. *See STX, Inc. v. Brine, Inc.,* 37 F.Supp.2d 740, 752 (D.Md.1999). "The preamble is that portion of the claim preceding the word 'comprising.'" *Boehringer Ingelheim Animal Health, Inc. v. Schering-Plough Corp.*, 984 F.Supp. 239, 247 (D.N.J.1997). "The preamble is an introductory phrase that may summarize the invention, its relation to the prior art, or its intended use or properties .... [i]t may also constitute a limitation." *See* Donald A. Chisum, *Patents* § 8.06 (1994). "[A] claim preamble has the import that the claim as a whole suggests for it." *Bell Communications Research, Inc. v. Vitalink Communications Corp.*, 55 F.3d 615, 620 (Fed.Cir.1995). On the other hand, claim limitations serve to "point out distinctly the process, machine, manufacture or composition of matter which is patented ... not its advantages." *See Preemption Devices, Inc. v. Minnesota Mining & Manuf. Co*., 732 F.2d 903, 907 (Fed.Cir.1984); 35 U.S.C. § 101. Thus, whether a preamble contains a limitation or

---

[5] Siemens makes the same argument in regard to independent claim 19 and dependent claim 28.

- 9 -

> merely a statement of purpose can only be decided "on review of the entirety of the patent to gain an understanding of what the inventors actually invented." *Rowe v. Dror*, 112 F.3d 473, 477 (Fed.Cir.1997); *see also General Electric Co. v. Nintendo Co.*, 179 F.3d 1350, 1361 (Fed.Cir.1999).
>
> Though still somewhat "opaque," certain rules for analyzing preambles have developed. *See* Patrick J. Flimm, *Claim Construction Trends in the Federal Circuit*, 572 PLI/PAT 317, 335-36 (1999) (characterizing the preamble/limitations test as "opaque" and without a set framework). However, "[t]he Federal Circuit has made it reasonably clear that the mere fact that a patentee finds something useful in a claim preamble in the [patent] litigation does not alone justify treatment of a claim preamble as a limitation." *See STX*, 37 F.Supp.2d at 752. If the body of the claim sets out a "structurally complete" invention, it is not a limitation. *See Rowe*, 112 F.3d at 478. Thus, where:
>
>> the body of the claim fully and intrinsically sets forth the complete invention, including all of its limitations, and the preamble offers no distinct definition of any of the defined claims limitations, but rather merely states, for example, the purpose or intended use of the invention, then the preamble is of no significance to claim construction because it cannot be said to constitute or explain a claim limitation.
>
> *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1305 (Fed.Cir.1999). Conversely, where the claim preamble "is necessary to give life, meaning, and vitality to the claim" or is "essential to point out the invention defined by the claim," it should be construed as a claim limitation. *See Pitney Bowes*, 182 F.3d at 1305-06; Boehringer, 984 F.Supp. at 247; *see also General Electric*, 179 F.3d at 1361.

*Bristol-Myers Squibb Co. v. Immunex Corp.*, 86 F. Supp. 2d 447, 450-51 (D.N.J. 2000).

As used in the preamble of claim 1 and claim 19, the term "enhancing performance" describes the purpose of the invention. It does not constitute a limitation. Therefore the doctrine of claim differentiation is not applicable, and construing the term to mean "increasing the light yield and improving the energy resolution" would not render meaningless any dependent clauses in which light yield actually increases or energy resolution actually improves.

A finding that the term "enhancing performance" does not constitute a limitation likely moots the need to construe the term itself. However, to the extent the term requires construction, a review of the specification demonstrates that the inventor does assert that the patented method can improve both light yield and energy resolution at the same time. For example:

> At 1400 degrees C, it is possible to fully oxygenate both Ce:LSO and Ce:LYSO in 30 hours. After full oxygenation, there is great improvement in light yield (LY) and energy resolution (ER%) for both crystals.

(Patent Col. 11 ll. 30-35). The patent also reveals that these qualities do not move in lockstep, and that improving one does not always result in an improvement to the other. However, in this context "enhancing performance" describes the purpose of the invention rather than its necessary outcome, and improving both these qualities would be better than improving only one or the other. The Court will construe the term to mean "increasing the light yield and improving the energy resolution".

## BODY OF MONOCRYSTALLINE LSO

Siemens suggests that this term, which appears in the body of both claim 1 and claim 19, as well as several dependent claims, should be construed to mean "a single crystal of LSO". The phrase "single crystal of LSO" does appear at some points in the specification (though not as often as the phrase "body of monocrystalline LSO"), but it does not appear in any claim.

CPI asserts (and Siemens does not dispute) that the term "monocrystalline" is understood by those versed in the relevant arts to mean that the entire crystal has the same underlying structure, as opposed to "polycrystalline." (Doc. 54 at 12). The construction proposed by Siemens eliminates this distinction with no rationale for doing so.

Siemens would also substitute "single crystal" for "body" without a sound basis for doing so. (Doc. 51 at 16). Siemens contends that the term "body" is vague when utilized "in a

technology that involves molten powders becoming a solid crystal." However, as noted above, the patented method is applied to crystals after they have been grown, not to the molten powders, a point reinforced by the patent's use of the term "monocrystalline" to modify "LSO." The Court sees no reason to construe this phrase, and will apply its plain and ordinary meaning.

### DIFFUSING OXYGEN INTO THE BODY OF MONOCRYSTALLINE LSO

This phrase is stated in independent claim 1 and present in dependent claims 2-18. Siemens proposes that "diffusing oxygen into" should be construed to mean "introducing oxygen into at least a portion of". CPI proposes that it be interpreted as "moving oxygen atoms from an ambient into". (The remainder of the phrase – *i.e.*, "the body of monocrystalline LSO" -- is addressed above.) "Diffusing oxygen into" is an easily understood phrase, and neither party has provided a persuasive argument that it should be interpreted in an unusual fashion here. The Court declines to give it an alternative construction.

### HEATING

Siemens contends that this term should be construed to mean "supplying heat such that the temperature either increases or remains constant." Siemens provides no support in either the intrinsic evidence or extrinsic evidence for such a convoluted interpretation of this simple and readily understood term. "Heating" will be given its ordinary and customary meaning.

### HEATING THE BODY FOR A PERIOD TIME

This term appears in independent claim 1. CPI seeks to have it construed as meaning "heating the body to a temperature of between about 1100 ° C to 1400º C for a period of about 30 to 120 hours." Siemens argues against inclusion of the temperature and time period ranges on the grounds that doing so would violate the doctrine of claim differentiation. Claim 11 and claim 13, both of which depend from claim 1, read as follows:

> 11. The method of claim 1, wherein heating the body of monocrystalline LSO comprises heating the body to a temperature in a range of between about 1100º to 1400º C.
>
> 13. The method of claim 1, wherein the period of time is in a range of about 30 to 120 hours.

Siemens argues that inclusion of CPI's proposed temperature and time period ranges in claim 1 would render claim 11 and claim 13 meaningless, as the limitations they set forth would already be present in the claim 1.

Unlike the term "enhancing performance," which appeared in the preamble to the independent clauses, the phrase "heating the body for a period of time" appears in the body of claim 1. As such, "heating the body for a period of time" must be construed as a limitation in claim 1. Dependent claims 11 and 13 add particular limitations regarding the temperature range and time period; this gives rise to a presumption that those limitations are not present in independent claim 1. *See Phillips,* 415 F.3d at 1315. To overcome this presumption, CPI's only argument is that its defined ranges would "reduce ambiguity and offer worthwhile assistance to the factfinder." (Doc. 54 at 16). This is insufficient to overcome the presumption. The term at issue is broad, but not ambiguous. And even if assisting the factfinder (rather than determining how the term would be understood by one skilled in the relevant art) were the goal here, importing these ranges into claim 1 does not provide any such assistance.

### "AMBIENT CONTAINING OXYGEN" OR "OXYGEN CONTAINING AMBIENT"

The first phrase appears in independent claim 1 and the second phrase appears in dependent claims 8 through 10. No party has suggested different meanings for the two phrases, and therefore the Court will consider them together.

Although nothing in the patent explicitly sets such a threshold, both parties agree that the ambient must contain more than one percent oxygen to practice the claimed invention. Claims 1-4

and 16-18 in Chai's application were rejected under 35 U.S.C. Section 102(b) as being anticipated by U.S. Patent No. 5,660,627 (the "Manente patent"), which taught a method of forming an LSO crystal inside an iridium crucible by heating the crystal in a nitrogen atmosphere that could include "a small amount of oxygen". (Doc. 51-4 at 8). After the rejection of these claims, Chai's attorney replied to the examiner that while iridium crucibles are subject to oxidation at high temperatures (thus necessitating the use of an inert ambient such as nitrogen at those temperatures), a complete absence of oxygen during the forming of the LSO crystal inside an iridium crucible would result in iridium flaking off the wall of the crucible, fouling the surface of the melt. (Doc. 51-4 at 23-24). Thus, it was typical to add a small amount of oxygen – "about 1%" – to the ambient in the crucible, so as to burn off any loose iridium particles and keep the melt surface clean. (Doc. 51-4 at 24). However, Chai's attorney added

> as … would be appreciated by those skilled in the art, this amount of oxygen is not enough to oxygenate the crystal. Indeed there is no disclosure or teaching in the cited reference of diffusing oxygen into the body of monocrystalline LSO at all.

(Doc. 51-4 at 24). Subsequently, the examiner withdrew this prior art rejection.

Based on this history, CPI asserts that the phrases "ambient containing oxygen" and "oxygen containing ambient" should be construed to mean "an ambient containing more than 1 percent of oxygen." Siemens argues that the threshold must be set higher. Siemens points out that where the specification of the '261 patent describes the concentration of oxygen in the ambient, that concentration is always equal to that of air, or greater.[6] For example, the summary provides that

> The oxygen containing ambient may, in some embodiments, comprise air at atmospheric pressure. In other embodiments, the oxygen containing ambient may be at a pressure above atmospheric.

---

[6] Siemens asserts, and CPI does not dispute, that the concentration of oxygen in air is about 21 percent.

> The oxygen containing ambient may also have an oxygen concentration higher than in air.

(Patent Col. 4 at ll. 41-45). The specification also recounts the results of numerous experiments in which the patented method was performed on LSO crystals "in air." (Patent Col. 10 ll. 29-67, Col. 11 ll. 1-45). Because the patent never discusses an ambient containing a concentration of oxygen less than that of air, Siemens argues that "ambient containing oxygen" and "oxygen containing ambient" should be construed to mean "a gas that has an oxygen concentration of approximately the oxygen concentration of air or greater." Siemens offers no rationale for construing "ambient" as meaning "gas," and therefore the Court will not limit the term in that way. And as was the case with regard to the location requirement that Siemens sought to import from the specification into the preamble of the independent claims, Siemens offers no intrinsic or extrinsic evidence for importing an air-or-greater requirement here aside from than the fact that air was the ambient utilized in Chai's experiments. The reasons for utilizing air rather than some other oxygen-containing ambient are obvious, so its use in Chai's experiments, alone, is not evidence that a lesser concentration of oxygen will would not oxygenate the crystal. The Court will adopt CPI's proposed construction of these terms.

## OXYGEN VACANCY

Siemens argues that it would be helpful to the jury to define this term, which is stated in independent claim 19. Siemens may be correct, but for purposes of a *Markman* order, the question is not how the term should be explained to a jury, but rather how the term would be understood by one skilled in the relevant art. CPI argues that the plain and ordinary meaning of the term should be applied, and points to the following definition for "vacancy" -- "an unoccupied site for an atom or ion in a crystal" – taken from an online dictionary.[7] In the absence of any indication that this

---

[7] *See generally*, http://www.merriam-webster.com/dictionary/vacancy, retrieved December

term was used in an unusual way in the '261 Patent, the Court will apply this definition, inserting the word "oxygen" between the words "an" and "atom".

### SUPPLYING OXYGEN TO FILL AT LEAST SOME OF THE OXYGEN VACANCIES IN THE BODY OF MONOCRYSTALLINE LSO

Finally, both parties also sought to have this phrase construed, but all of its constituent parts have been addressed above.

**DONE** and **ORDERED** in Orlando, Florida on December 14, 2012.

GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties

13, 2012.